No. 96-202

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997


LINDA M. GRYCZAN, ANNE K. GEHR,
STACEY HAUGLAND, DONALD HOWARD,
DOYLE F. FORISTER, and WILLIAM C.
SUMMERS,
Plaintiffs and Respondents,

v.

STATE OF MONTANA,
Defendant and Appellant.


APPEAL FROM:   District Court of the First Judicial District,
In and for the County of Lewis and Clark,
The Honorable Jeffrey M. Sherlock, Judge presiding.

COUNSEL OF RECORD:

For Appellant:
Joseph P. Mazurek, Attorney General, Clay R. Smith, Solicitor, Helena,
Montana

For Respondents:
Holly J. Franz, Gough, Shanahan, Johnson & Waterman, Helena,
Montana; Rosemary Daszkiewicz, Cairncross & Hempelmann, Seattle,
Washington (Womenþs Law Center)

For Amici Curiae:
Prof. Larry Elison, Prof. Thomas Huff, Deirdre Runnette, University of
Montana, School of Law, Missoula, Montana (Womenþs Law Caucus);
Joan Jonkel, Missoula, Montana (Montana Public Health Association); J. Stuart
Bradshaw, Stevensville, Montana (Montana Citizens for Decency Through
Law); Mark S. Connell, Connell & Beers, Missoula, Montana; Suzanne
B. Goldberg, Ruth E. Harlow, New York, New York (Lambda Legal Defense
and Education Fund, et al.); Matthew Coles, New York, New York
(American        Civil Liberties Union)


Heard:April 11, 1997
Submitted: April 17, 1997

Decided:     July 2, 1997

Filed:

_____

Clerk


Justice James C. Nelson delivered the Opinion of the Court.


The State of Montana appeals a Judgment of the District Court for the First Judicial District, Lewis and Clark County, declaring  45-5-505, MCA, unconstitutional as a violation of the privacy provision of the Montana Constitution when applied to consensual, private, same-gender sexual conduct between adults. We affirm.

The State raises the following issues:

1.  Whether Respondents have standing to maintain an as-applied challenge to the constitutionality of  45-5-505, MCA.

2.  Whether  45-5-505, MCA, infringes on Respondents' right to privacy under Article II, Section 10 of the Montana Constitution to the extent it prohibits consensual, private, same-gender sexual conduct between adults.

3.  Whether  45-5-505, MCA, violates Article II, Section 4 of the Montana Constitution by infringing on Respondents' dignity as human beings, discriminating against them on the basis of sex, or denying them equal protection of the laws to the extent it prohibits consensual, private, same-gender sexual conduct between adults.

Having affirmed the trial court as to issues 1 and 2, we decline to address issue 3.

Background

On December 6, 1993, Respondents filed a declaratory judgment action, pursuant to Title 27, chapter 8 of the Montana Code, challenging the constitutionality of that portion of Montana's deviate-sexual-conduct statute,  45-5-505, MCA, that criminalizes consensual sex between adults of the same gender.  Respondents contend that  45-5-505, MCA, is unconstitutional under Article II, Sections 4 and 10 of the Montana Constitution and that it violates the due process clause of the Fourteenth Amendment to the United States Constitution.

Respondents are three men and three women residing in Montana who are homosexuals.  They assert that they have in the past and intend in the future to engage in conduct that violates  45-5-505, MCA.  This statute provides:

Deviate Sexual Conduct.  (1) A person who knowingly engages in deviate sexual relations or who causes another to engage in deviate sexual relations commits the offense of deviate sexual conduct.

(2) A person convicted of the offense of deviate sexual conduct shall be imprisoned in the state prison for any term not to exceed 10 years or be fined an amount not to exceed $50,000, or both.

(3) The fact that a person seeks testing or receives treatment for the HIV-related virus or another sexually transmitted disease may not be used as a basis for a prosecution under this section and is not admissible in

evidence in a prosecution under this section.

The phrase "deviate sexual relations" is defined at 45-2-101(20), MCA, as "sexual contact or sexual intercourse between two persons of the same sex or any form of sexual intercourse with an animal." "Sexual contact" and "sexual intercourse" are defined as:

"Sexual contact" means any touching of the sexual or other intimate parts of the person of another for the purpose of arousing or gratifying the sexual desire of either party.

Section 45-2-101(65), MCA.

"Sexual intercourse" means penetration of the vulva, anus, or mouth of one person by the penis of another person, penetration of the vulva or anus of one person by any body member of another person, or penetration of the vulva or anus of one person by any foreign instrument or object manipulated by another person for the purpose of arousing or gratifying the sexual desire of either party. Any penetration, however slight, is sufficient.

Section 45-2-101(66), MCA.

Section 45-5-505, MCA, was enacted in 1973 as part of the criminal law revision. Prior to 1973, Montana law had prohibited "crimes against nature" with persons or animals. Section 45-5-505, MCA, was amended in 1981 to add a maximum fine of $50,000 as part of the penalty provision. In 1991, a subsection providing a greater penalty when the conduct was nonconsensual was deleted and a subsection prohibiting the use of information regarding the testing of or the treatment for the HIV-related virus as evidence in a prosecution was added. Efforts to repeal the statute were rejected in 1991, 1993, and 1995.

On January 18, 1994, the State moved to dismiss the declaratory judgment action contending that Respondents lacked standing to challenge the statute, and that there is no justiciable controversy. The District Court denied the State's motion on June 28, 1994. The parties filed cross-motions for summary judgment in September 1995. The District Court subsequently granted Respondents' motion concluding that a justiciable controversy existed and that Respondents had standing to challenge the statute because they feared prosecution and were harmed by the very existence of the statute. The court also concluded that 45-5-505, MCA, infringed on Respondents' right to privacy under Article II, Section 10 of Montana's Constitution and that the State failed to demonstrate a compelling interest justifying the infringement of that right. The State appeals.

Standard of Review

Our standard of review in appeals from summary judgment rulings is de novo. Motarie v. N. Mont. Joint Refuse Disposal (1995), 274 Mont. 239, 242, 907 P.2d 154, 156; Mead v. M.S.B., Inc. (1994), 264 Mont. 465, 470, 872 P.2d 782, 785. When we

review a district court's grant of summary judgment, we apply the same evaluation as the district court based on Rule 56, M.R.Civ.P. Bruner v. Yellowstone County (1995), 272 Mont. 261, 264, 900 P.2d 901, 903. In Bruner, we set forth our inquiry:

The movant must demonstrate that no genuine issues of material fact exist. Once this has been accomplished, the burden then shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine issue does exist. Having determined that genuine issues of fact do not exist, the court must then determine whether the moving party is entitled to judgment as a matter of law. We review the legal determinations made by a district court as to whether the court erred.

Bruner, 900 P.2d at 903 (citations omitted).

Issue 1.

Whether Respondents have standing to maintain an as-applied challenge to the constitutionality of 45-5-505, MCA.

The State maintains that without a concrete factual context, Respondents' challenge presents a political dispute properly decided in a legislative and not in a judicial forum. The State contends that to establish a justiciable controversy under Article VII, Section 4(1) of the Montana Constitution, Respondents are required to show an "injury in fact" and that no such injury exists here because there is no evidence of a credible threat of prosecution under the statute since no one has been prosecuted for engaging in consensual, adult, private, same-gender sexual conduct since the statute was enacted. The State also contends that Respondents do not have standing to challenge the constitutionality of 45-5-505, MCA, because they have never been arrested or prosecuted for violating the statute. The State maintains that the mere apprehension of prosecution or the fact that a person may feel denigrated by the law is not sufficient for standing purposes and where an as-applied challenge is at stake, as in this case, resolution of the constitutional issue should await an actual instance of the statute being applied.

Respondents brought this action under the Uniform Declaratory Judgments Act (the Act) found at Title 27, Chapter 8, of the Montana Code. Respondents argue that this Court has held that a party raising a "bona fide constitutional issue" can seek relief from the courts through a declaratory judgment action. Stuart v. Dept. of Social & Rehab. Serv. (1991), 247 Mont. 433, 438-39, 807 P.2d 710, 713 (quoting Mitchell v. Town of West Yellowstone (1988), 235 Mont. 104, 109-10, 765 P.2d 745, 748). Furthermore, Respondents point out, the Act itself provides that it is remedial and that it is to be liberally construed and administered to permit courts "to afford relief from uncertainty

and insecurity with respect to rights, status, and other legal relations . . . ." Section 27-8-102, MCA.

Respondents argue that, although they have never been arrested or prosecuted under the statute, they have been injured and continue to be injured by the mere existence of the statute. They contend that the damage to their self-esteem and dignity and the fear that they will be prosecuted or will lose their livelihood or custody of their children create an emotional injury that gives them standing to challenge the statute. For example, two Respondents are employed or are seeking employment in positions requiring state licenses. Because they engage in conduct classified as a felony, they fear they could lose their professional licenses. One Respondent is the mother of a five-year old boy. She fears that the statute could be used to limit her relationship with her son.

To address this issue we look first to whether the case presents a justiciable controversy and then to whether Respondents have standing to bring this constitutional challenge. The test of whether a justiciable controversy exists is: (1) that the parties have existing and genuine, as distinguished from theoretical, rights or interests; (2) the controversy must be one upon which the judgment of the court may effectively operate, as distinguished from a debate or argument invoking a purely political, administrative, philosophical or academic conclusion; and (3) the controversy must be one the judicial determination of which will have the effect of a final judgment in law or decree in equity upon the rights, status or legal relationships of one or more of the real parties in interest, or lacking these qualities, be of such overriding public moment as to constitute the legal equivalent of all of them. Lee v. State (1981), 195 Mont. 1, 6, 635 P.2d 1282, 1284-85 (citing Matter of Secret Grand Jury Inquiry (1976), 170 Mont. 354, 357, 553 P.2d 987, 990). This Court concluded in Lee that the plaintiff in that case fit all three of these criteria because he was directly affected by the operation of the statute at issue. So too, Respondents in the instant case are directly affected by 45-5-505, MCA, and the controversy at issue fulfills each of these three criteria. First, Respondents have a genuine interest in the outcome of this case. Second, the controversy is one upon which the judgment of the court may effectively operate. The District Court issued a permanent injunction forbidding the State to enforce the statute against Respondents or any other Montanans who engage in homosexual activity if that activity is consensual, private and engaged in by adults. Third, the District Court's determination has the

effect
of a final judgment in law upon Respondents' rights.
The question of standing is whether the litigant is entitled to have the court decide
the merits of the dispute or of particular issues.  Helena Parents v. Lewis & Clark Cty.
(1996), 277 Mont. 367, 371, 922 P.2d 1140, 1142 (citing Warth v. Seldin (1975), 422
U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343).  Furthermore, when standing is
placed  at issue in a case, the question is whether the person whose standing is challenged
is a proper party to request an adjudication of a particular issue and not whether the issue
itself is justiciable.  Helena Parents, 922 P.2d at 1142 (citing Flast v. Cohen (1968), 392
U.S. 83, 99-100, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947).
We have previously stated that the following criteria must be satisfied to establish
standing:

(1)  The complaining party must clearly allege past, present or
threatened injury to a property or civil right; and (2) the alleged injury must
be distinguishable from the injury to the public generally, but the injury
need not be exclusive to the complaining party.

Helena Parents, 922 P.2d at 1142-43 (citing Sanders v. Yellowstone County (1996), 276
Mont. 116, 119, 915 P.2d 196, 198; Stewart v. Bd. of Cty. Com'rs of Big Horn Cty.
(1977), 175 Mont. 197, 201, 573 P.2d 184, 186).
The State argues that since the statute has never been enforced against consenting
adults, there is no "threatened injury" to Respondents.  The State relies on Doe v. Duling
(4th Cir. 1986), 782 F.2d 1202, for its contention that prosecution under a criminal
statute must be imminent before standing to challenge the statute is established.  Duling
involved a challenge by two unmarried adults to Virginia statutes prohibiting fornication
and cohabitation by unmarried persons.  Both plaintiffs alleged they had engaged in
sexual intercourse with unmarried members of the opposite sex and one plaintiff alleged
she had cohabited with an unmarried man.  Neither plaintiff had been prosecuted or
threatened with prosecution under the statutes, but they alleged that they were fearful of
prosecution and that that fear had caused them to refrain from engaging in the prohibited
activities.  Duling, 782 F.2d at 1204.
The United States District Court for the Eastern District of Virginia found that
plaintiffs had standing to maintain the action and ruled in their favor on the merits.  The
Fourth Circuit Court of Appeals reversed, holding that plaintiffs did not have standing.
The Court of Appeals stated that an individual challenging the validity of a criminal
statute must show a threat of prosecution both real and immediate to present a case

or controversy and that the plaintiffs in Duling faced only the most theoretical threat of prosecution. Duling, 782 F.2d at 1206.

We conclude that the State's reliance on Duling is misplaced. The challenged statutes in Duling had not been enforced for more than 100 years and there was no evidence that they were anything more than historical artifacts. While 100 years of nonenforcement may make a law so moribund that any fear of prosecution is imaginary, the United States Supreme Court has held that even 40 years of nonenforcement does not deprive a court of jurisdiction to determine a law's constitutionality. See, e.g., Epperson v. Arkansas (1968), 393 U.S. 97, 101-02, 89 S.Ct. 266, 269, 21 L.Ed.2d 228. The challenged statute in the case before us is only 24 years old and has been amended as recently as 1991. This, and other prior amendments, make it clear that the Montana Legislature not only contemplates prosecution, but also considers the possibility realistic enough to require the addition of a subsection preventing the use of evidence of testing or treatment for the HIV-related virus or other sexually-transmitted diseases as a basis for prosecution under the statute. Moreover, the legislature has decided three times in the last seven years not to repeal the statute.

The State's position that Respondents lack standing because they have not been prosecuted under the statute is at odds with prior decisions of this Court as well as prior decisions of the United States Supreme Court. In Lee v. State (1981), 195 Mont. 1, 635 P.2d 1282, we did not require the plaintiff to suffer arrest to challenge a criminal statute. We held in Lee, that plaintiff had standing to challenge the 55-mph speed limit even though he had not been arrested for speeding, because otherwise, acts of the legislature that affect large segments of the public would be insulated from judicial attack. Lee, 635 P.2d at 1285.

The State argues that Lee is distinguishable from the case before us because Lee involved a facial challenge to a statute, while the case before us involves an as-applied challenge to a statute. In addition, the State points out that the challenged statute in Lee had been enforced for some time before it was challenged, while the statute here has not been enforced against consenting adults. We conclude that Lee is not distinguishable from the instant case simply because the statute at issue here has not been enforced against persons such as Respondents. Here, Respondents are precisely the individuals the statute is designed to impact. Moreover, there is nothing to prevent a county attorney from enforcing the statute against consenting adults. "It is well established that a decision

as to whether or not to prosecute and what charge to bring against an individual is entirely within the discretion of the county attorney."  Helena Parents, 922 P.2d at 1145 (citing State v. Lemmon (1984), 214 Mont. 121, 126, 692 P.2d 455, 457).

Similarly, the United States Supreme Court has concluded that a plaintiff need not suffer arrest to challenge a criminal statute.  See Epperson, 393 U.S. at 100-102, 89 S.Ct. at  268-69, 21 L.Ed.2d 228 (high school science teacher challenging the constitutionality of a 1928 criminal law prohibiting the teaching of evolution found to have standing without any record of prosecutions under the law because the teacher was directly affected by the law); Doe v. Bolton (1973), 410 U.S. 179, 93 S.Ct 739, 35 L.Ed.2d 201 (doctors challenging certain provisions of Georgia's abortion laws found to have standing without arrest because they were the ones against whom the criminal statutes directly operated); Babbitt v. United Farm Workers (1979), 442 U.S. 289, 99 S.Ct. 2301, 60 L.Ed.2d 895 (a union and its members had standing to challenge a statute imposing criminal penalties for certain types of union publicity despite the state's argument that the criminal penalties had never been and might never be applied); Virginia v. American Booksellers Assn. (1988), 484 U.S. 383, 108 S.Ct. 636, 98 L.Ed.2d 782 (booksellers had standing to bring a pre-enforcement challenge to a statute making it unlawful to knowingly display sexually-explicit material in a manner accessible to juveniles because the law was aimed directly at the booksellers).

The existence of a criminal law aimed specifically at one group of citizens, the enforcement of which has not been disavowed by the state, creates a fear of prosecution sufficient to confer standing unless there are other circumstances which make that fear "imaginary" or "wholly speculative."  Babbitt, 442 U.S. at 302, 99 S.Ct. at 2310-11, 60 L.Ed.2d 895.  Moreover,

when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative a plaintiff need not "first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute."  [Citation omitted.]  . . . [T]he criminal penalty provision applies in terms to "[a]ny person . . . who violates any provision" of the Act.  Moreover, the State has not disavowed any intention of invoking the criminal penalty provision against [plaintiffs].  Appellees are thus not without some reason in fearing prosecution. . . .  In our view, the positions of the parties are sufficiently adverse with respect to the . . . provision . . . to present a case or controversy within the jurisdiction of the District Court.

Babbitt, 442 U.S. at 302, 99 S.Ct. at 2310-11, 60 L.Ed.2d 895.  Additionally, at least one circuit court has held that nothing short of an express unconditional statement that the law will not be enforced will bar plaintiffs from challenging a law.  See, e.g., United

Food & Com. Workers Intrn. v. IBP, Inc. (8th Cir. 1988), 857 F.2d 422, 427-28. Here, the State has made no such disavowal.

In addition to alleging a past, present or threatened injury, Respondents must establish that the alleged injury is distinguishable from any injury to the general public, but the injury need not be exclusive to Respondents. Helena Parents, 922 P.2d at 1142-43. Here, the District Court concluded that Respondents are affected psychologically by the statute in a more acute fashion than persons who do not engage in same-gender sexual conduct. Thus, the general public does not suffer any injury under the statute because the statute does not criminalize sexual conduct between heterosexuals. The statute only criminalizes sexual conduct between homosexuals.

The psychological injuries suffered by Respondents stem from the repression of their desires for sexual expression and from deprivation of their personal autonomy. In addition, there is evidence to show that there is a correlation between homosexual sodomy laws and homophobic violence. The National Institute for Justice has concluded that gays are the most frequent victims of hate violence today. Thus, homosexuals in Montana live not only with the psychological impact of the fear of prosecution under the statute but the fear that violence may be directed at them because they are seen as criminals.

The State, on the other hand, contends that any psychological harm the statute may inflict upon Respondents is not enough to establish standing. The State relies on Allen v. Wright (1984), 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556, for this contention. In Allen, the parents of several black children attending public school challenged the failure of the Internal Revenue Service to deny tax-exempt status to private schools allegedly discriminating on the basis of race. Since these parents had not attempted and had no desire to attempt to enroll their children in the schools, the United States Supreme Court held that the parents did not have standing as they had not alleged a personal injury traceable to the schools' allegedly unlawful conduct. The case before us on appeal is distinguishable from Allen in that, rather than relying on a general stigmatic injury, Respondents have presented evidence of specific psychological effects caused by the statute. Moreover, unlike the parents who brought suit in Allen, Respondents are those persons who are personally denied equal treatment.

Because the legislature does not regard the statute as moribund and because enforcement has not been foresworn by the Attorney General, we agree that Respondents suffer a legitimate and realistic fear of criminal prosecution along with other

psychological harms. Respondents are precisely the individuals against whom the statute is intended to operate. This is sufficient to give Respondents standing to challenge the constitutionality of the statute. Moreover, to deny Respondents standing would effectively immunize the statute from constitutional review. Accordingly, we hold that a justiciable controversy exists and that Respondents have standing to challenge the constitutionality of 45-5-505, MCA.

Issue 2.

Whether 45-5-505, MCA, infringes on Respondents' right to privacy under Article II, Section 10 of the Montana Constitution to the extent it prohibits consensual, private, same-gender sexual conduct between adults.

In its February 16, 1996 Order on Motions for Summary Judgment, the District Court concluded that 45-5-505, MCA, violates Respondents' right to privacy guaranteed by the Montana Constitution and that that invasion of privacy is not justified by any compelling state interest. The court recognized that since Respondents did not present a facial attack upon the statute, it could not declare the statute unconstitutional as to any and all sets of circumstances that might arise. However, the court issued a permanent injunction forbidding the State to enforce the statute against Respondents or any other people in the State of Montana who engage in consensual, adult, private, same-gender sexual conduct. In addressing this issue we determine, first, whether Respondents' sexual conduct prohibited by 45-5-505, MCA, is protected by Montana's constitutional right of privacy and then, if it is protected, whether the State has demonstrated a compelling interest for infringing that right. We begin our discussion with a brief overview of the right of privacy under the federal constitution.

The federal constitution does not explicitly grant citizens the right to privacy. That right has been inferred, however, from other provisions of the constitution and is used particularly in search and seizure contexts. Justice Louis Brandeis, in his dissenting opinion in Olmstead v. United States first argued that the Fourth Amendment protected an individual's right of privacy from invasions by the government.

The makers of our Constitution . . . conferred, as against the Government, the right to be let alone--the most comprehensive of rights and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the Government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment.

Olmstead v. United States (1928), 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed.2d

944, overruled by Katz v. United States (1967), 389 U.S. 347, 88 S.Ct. 507, 19 L. Ed.2d 576.

In his concurrence to the majority's opinion in Katz, Justice Harlan summarized the rule that has emerged from Katz and from prior decisions regarding privacy in the context of a search as requiring, "first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" Katz, 389 U.S. at 361, 88 S.Ct. at 516, 19 L.Ed.2d 576. This two-prong test was later adopted by the United States Supreme Court in its decision in Smith v. Maryland (1979), 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220.

In addition to a right of privacy underlying the Fourth Amendment, an aspect of privacy has been tied to an individual's liberty interest. In Griswold v. Connecticut (1965), 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510, the United States Supreme Court held that laws forbidding the use of contraceptive devices violated the right of marital privacy which the Court determined is within the penumbra of specific guarantees of the Bill of Rights. Six of the justices deciding Griswold recognized the right of privacy to be a fundamental right protected by the federal constitution.

While the right of privacy enunciated in Griswold has been recognized by the United States Supreme Court to protect certain personal decisions, other personal choices have been excluded. In Bowers v. Hardwick (1986), 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140, after being charged with violating a Georgia statute criminalizing sodomy by committing that act with another adult male in the privacy of his home, Hardwick brought suit to challenge the constitutionality of the statute. The United States Supreme Court determined that the federal constitution does not confer a fundamental right upon homosexuals to engage in sodomy, thus the statute was held to be constitutional. However, Justice Blackmun dissenting in Bowers, articulated that Bowers was not about the right to engage in homosexual sodomy, but rather it was about "the right to be let alone" as enunciated by Justice Brandeis' dissent in Olmstead. Bowers, 478 U.S. at 199, 106 S.Ct. at 2848, 92 L.Ed.2d 140.

Regardless of whether Bowers was correctly decided, we have long held that Montana's Constitution affords citizens broader protection of their right to privacy than does the federal constitution. See State v. Siegal (Mont. 1997), 934 P.2d 176, 183, 54 St.Rep. 158, 163-64. Unlike the federal constitution, Montana's Constitution explicitly grants to all Montana citizens the right to individual privacy. Article II, Section 10 of

the Montana Constitution provides:

Right of privacy.  The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.

Since the right to privacy is explicit in the Declaration of Rights in Montana's Constitution, it is a fundamental right and any legislation regulating the exercise of a fundamental right must be reviewed under a strict-scrutiny analysis.  To withstand a strict-scrutiny analysis, the legislation must be justified by a compelling state interest and must be narrowly tailored to effectuate only that compelling interest.  Siegal, 934 P.2d at 184 (citing State v. Pastos (1994), 269 Mont. 43, 47, 887 P.2d 199, 202).

The District Court  held that   45-5-505, MCA, violated Respondents' right to privacy under the Montana Constitution.  Relying on the two-prong test set forth in Katz and adopted by this Court in  Hastetter v. Behan (1982), 196 Mont 280, 639 P.2d 510, the District Court concluded that Respondents' same-gender sexual activities are covered by Montana's right to privacy.  The court found that Respondents have  an expectation of privacy in the activities proscribed by the statute since "a person's decision as to sexual matters is probably one of the most private areas of a person's life."  Furthermore, the court determined that while many Montanans do not approve of homosexual activity, that is not to say that society is unwilling to recognize as reasonable an expectation of privacy as to consensual, adult, private, same-gender sexual conduct.  Because the State failed to demonstrate a compelling interest justifying the infringement of Respondents' right to privacy, the court granted summary judgment to Respondents.

The State, while  acknowledging the existence of an individual's right to privacy under Article II, Section 10, contends that it does not immunize adult same-gender sexual conduct from state regulation.  The State maintains that the United States Supreme Court already resolved this issue in Bowers and that no right to privacy for this conduct exists.

The State also contends that the appropriate test for determining whether a fundamental right to privacy exists is not the two-part test set out in Katz regarding informational privacy, but rather, a test regarding personal-autonomy privacy used by the United States Supreme Court in Bowers and derived from Palko v. Connecticut (1937), 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed.2d 288, overruled on other grounds by Benton v. Maryland (1969), 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707.  This test may be articulated as whether the statute in question "violate[s] those 'fundamental principles of liberty

and
justice which lie at the base of all our civil and political institutions.'" Palko, 302 U.S. at 328, 58 S.Ct. at 153, 82 L.Ed.2d 288.

We agree with the District Court that under traditional Katz analysis, Respondents' same-gender, consensual sexual conduct is protected by Montana's constitutional right of privacy. It cannot seriously be argued that Respondents do not have a subjective or actual expectation of privacy in their sexual activities. With few exceptions not at issue here, all adults regardless of gender, fully and properly expect that their consensual sexual activities will not be subject to the prying eyes of others or to governmental snooping or regulation. Quite simply, consenting adults expect that neither the state nor their neighbors will be co-habitants of their bedrooms. Moreover, while society may not approve of the sexual practices of homosexuals, or, for that matter, sodomy, oral intercourse or other sexual conduct between husband and wife or between other heterosexuals, that is not to say that society is unwilling to recognize that all adults, regardless of gender or marital state, at least have a reasonable expectation that their sexual activities will remain personal and private. Accordingly, we disagree with the State that the Katz test is inappropriate. It is, and under that test Respondents' right to privacy in their consensual, non-commercial sexual conduct is protected under Article II, Section 10 of Montana's Constitution.

As to Palko, this Court applied a Palko-derived test in Town of Ennis v. Stewart (1991), 247 Mont. 355, 807 P.2d 179, along with the Katz test. In Ennis, several property owners refused to hook up to the city water system arguing that they had a privacy right to use the wells in their homes. We stated that under the federal constitution, the right to privacy has been extended only to those rights which are fundamental or implicit in the concept of ordered liberty. Ennis, 807 P.2d at 182. We held in Ennis that the type of interest being infringed was not the kind sufficient for defendants to invoke the special protections of their privacy right. We stated that because the right being asserted was not of constitutional magnitude the Town need not show a compelling interest to satisfy its ends, rather it need only demonstrate that the ordinance bears a rational relationship to the achievement of a legitimate state interest. Ennis, 807 P.2d at 182.

While hooking up to a private well may not be the type of interest sufficient to invoke the special protections of a privacy right, adults engaging in consensual, non-commercial sexual activities in private is sufficient. More importantly, however,

regardless of whether same-gender, consensual sexual conduct is accorded federal constitutional, personal-autonomy privacy protection as a fundamental right or as a right implicit in the concept of ordered liberty, Montana's Constitution, as we have already pointed out, explicitly protects individual or personal-autonomy privacy as a fundamental right by its placement in the Declaration of Rights.  In fact, it is hard to imagine any activity that adults would consider more fundamental, more private and, thus, more deserving of protection from governmental interference than non-commercial, consensual adult sexual activity.

Accordingly, whether we apply the Katz test or the Palko test, we conclude that Respondents' right of privacy under Article II, Section 10 of Montana's Constitution includes the right to engage in consensual, non-commercial, private, same-gender sexual conduct with other adults free of governmental interference or regulation.

Finally, the State points out that the delegates to the 1972 Montana Constitutional Convention defeated a proposal to include a provision in the Declaration of Rights stating that "[p]rivate sexual acts between consenting adults do not constitute a crime." The State contends that this reflects an unwillingness to protect this type of conduct, even under the privacy clause. We do not agree.  The verbatim transcript of the 1972 Constitutional Convention is bereft of any discussion as to why the proposal was defeated. While the State can speculate that this reflects an unwillingness to protect this type of conduct, one can also speculate that the delegates believed it was already protected under the privacy clause.

In summary, and regardless of the sort of legal test used, we agree with the statement of the Tennessee  Court of Appeals when faced with a similar question of the extent of an individual's right to privacy under the Tennessee Constitution:

> We think it is consistent with this State's Constitution and constitutional jurisprudence to hold that an adult's right to engage in consensual and noncommercial sexual activities in the privacy of that adult's home is a matter  of intimate personal concern which is at the heart of Tennessee's protection of the right to privacy, and that this right should not be diminished or afforded less constitutional protection when the adults engaging in that private activity are of the same gender.

Campbell v. Sundquist (Tenn. Ct. App. 1996), 926 S.W.2d 250, 262.  We hold that Respondents' sexual conduct which is prohibited by  45-5-505, MCA, is protected by Article II, Section 10 of Montana's Constitution.

It follows then that since we have  concluded that  45-5-505, MCA, constitutes a governmental intrusion into Respondents' right to privacy, we must next determine

whether the State has a compelling interest warranting this intrusion.  The State contends
that this compelling interest includes protecting public health by preventing the spread of
the HIV-related virus and by protecting public morals.
The State's assertion that the statute protects public health by containing the spread
of AIDS relies on faulty logic and invalid assumptions about the disease.  To begin with,
45-5-505, MCA, was enacted in 1973, almost ten years before the first AIDS case was
detected in Montana.  Despite the two-plus decades that the statute has been in effect,
HIV infection is currently a significant cause of illness and death in this State, and AIDS
is now the sixth leading cause of death among middle-aged Montanans.
Moreover, the State's rationale assumes that all same-gender sexual conduct
contributes to the spread of the disease.  This is grossly inaccurate.  AIDS and HIV, the
virus that causes AIDS, are transmitted through the exchange of HIV-infected semen or
blood, as can occur during vaginal, anal and oral intercourse, or the sharing of
contaminated needles.  Sexual contact between women has an extremely low risk of HIV
transmission.  On the other hand, heterosexual contact is now the leading mode of HIV
transmission in this country.  The Montana Public Health Association (MPHA) reports that

> [a]ccording to the most recent Centers for Disease Control (CDC) data
> released at the XI International Conference on AIDS in July, 1996, the
> incidence of AIDS (newly reported cases) is growing most rapidly among
> heterosexuals.  In fact, the proportion of yearly reported AIDS cases
> resulting from heterosexual sex has increased steadily over time,
> multiplying by more than 5 times between 1985 and 1995.  In this same
> time period, the risk group designated þmen who have sex with menþ has
> accounted for a steadily decreasing proportion of newly reported AIDS
> cases, decreasing by more than 20% between 1985 and 1995.  In one year,
> 1993-1994, estimated AIDS  incidence among people infected
> heterosexually leapt up by 17%.  At this alarming rate, heterosexuals lead
> both þmen who have sex with menþ and þintravenous drug usersþ as the
> risk group with the fastest growing AIDS incidence.  In 1995, 65% of those
> infected through heterosexual contact were women.

HIV/AIDS Surveillance Report (1995) Vol. 7, No. 2, U.S. Department of Health and
Human Services; Public Health Service; Centers for Disease Control and Prevention;
National Center for HIV, STD, and TB Prevention.
Section 45-5-505, MCA, targets a wide range of behavior unrelated to the spread
of HIV.  For example, the term "sexual contact" in the statute encompasses touching,
caressing and kissing, activities that do not spread HIV.  Moreover, if two people are not
infected with HIV, they cannot spread it, yet sexual conduct between the two is
prohibited under the statute.  In addition, the statute does not account for "safe" versions
of the activities, i.e., use of a condom during any "sexual contact" which greatly reduces
or eliminates the risk of HIV transmission.  Thus, the inclusion of behavior not

associated
with the spread of AIDS and HIV and the exclusion of high-risk behavior among those other than homosexuals indicate the absence of any clear relationship between the statute and any public health goals.

The State contends that criminal sanctions help deter behavior, thereby reducing the spread of AIDS. The AIDS Prevention Act passed by the Montana Legislature in 1989 and found at Title 50, Chapter 16, Part 10 of the Montana Code, acknowledges that control of the spread of AIDS is dependent upon education of those infected or at risk of infection. Section 50-16-1002(1), MCA. MPHA, an association of 340 public health professionals throughout Montana, writing as amicus curiae, asserts that criminal sanctions are ineffective as a deterrent and are extremely harmful to public education and disease prevention efforts. MPHA argues that education and counseling are the most effective means of changing behavior and that criminal statutes seriously undermine public health strategies by causing individuals to conceal or distort relevant information and by inhibiting effective public education efforts. Accordingly, we conclude that public health goals attributed to 45-5-505, MCA, do not support a compelling interest for the infringement of Respondents' privacy rights.

The State also argues that it has a compelling interest in protecting public morals and that 45-5-505, MCA, advances that interest. The State contends that "societal notions" of appropriate sexual conduct provide rational grounds for 45-5-505, MCA, and that this is simply one of many areas of the law where legislative majorities have made moral choices contrary to the desire of minorities. In a similar vein, amicus Montana Citizens for Decency Through Law argues that this statute is deeply rooted in the values of the citizens of this State and that the legislature's prohibition against homosexual sex is a proper exercise of the decision-making power of that branch--as opposed to the judicial branch--on what is an important political, moral and public policy issue. We disagree.

We do not deny the legislature's public policy-making power, nor do we dispute that public policy and the laws implementing it may often reflect majority will and prevailing notions of morality. Nevertheless, it is axiomatic that under our system of laws, the parameters of the legislature's policy-making power are defined by the Constitution and that its ability to regulate morals and to enact laws reflecting moral choices is not without limits. As the Tennessee Court of Appeals pointed out in Campbell:

With respect to regulation of morals, the police power should properly be exercised to protect each individual's right to be free from interference in defining and pursuing his own morality but not to enforce a majority morality on persons whose conduct does not harm others. . . . Indeed, what is considered to be "moral" changes with the times and is

dependent upon societal background.  Spiritual leadership, not the government, has the responsibility for striving to improve the morality of individuals.

Campbell, 926 S.W.2d at 265-66 (quoting Commonwealth v. Bonadio (Pa. 1980), 415 A.2d 47, 50).

We agree with the State and with amicus that it is not the function of this or of any court to interpret the law on the basis of what may be morally acceptable or unacceptable to society at any given time.  It is not the judiciary's prerogative to condone or condemn a particular lifestyle and the behaviors associated therewith upon the basis of moral belief.

That said, it does not follow, however, that simply because the legislature has enacted as law what may be a moral choice of the majority, the courts are, thereafter, bound to simply acquiesce. Our Constitution does not protect morality; it does, however, guarantee to all persons, whether in the majority or in a minority, those certain basic freedoms and rights which are set forth in the Declaration of Rights, not the least of which is the right of individual privacy.  Regardless that majoritarian morality may be expressed in the public-policy pronouncements of the legislature,  it remains the obligation of the courts-- and of this Court in particular--to scrupulously support, protect and defend those rights and liberties guaranteed to all persons under our Constitution.   The oath of office taken by every justice and every judge in this state (not to mention every legislator as well) demands precisely that.  Art. III, Sec. 3, Mont.Const.

As we have already stated, in this State, under Montana's Constitution, the right of  individual privacy--that is, the right of personal autonomy or the right to be let alone-- is fundamental.  It is, perhaps, one of the most important rights guaranteed to the citizens of this State, and its separate textual protection in our Constitution reflects Montanans' historical abhorrence and distrust of excessive governmental interference in their personal lives.  That such interference is because the majority wills it is no less pernicious.

James Madison decried the potential for a tyranny of the majority, pointing out that it was as important in our system of government to guard the minority in our society against injustice by the majority, as it was to guard society from the oppression of its rulers.  The Federalist, No. 51, at 351 (James Madison) (Jacob E. Cooke ed., 1961).  Moreover,

[o]f all tyrannies a tyranny sincerely exercised for the good of its victims may be the most oppressive.  It may be better to live under robber barons than under omnipotent moral busybodies. The robber baron's cruelty may sometimes sleep, his cupidity may at some point be satiated; but those who torment us for our own good will torment us without end for they do so with the approval of their own conscience.

C.S. Lewis, The Humanitarian Theory of Punishment, in God in the Dock 287, 292 (1970).

The right of consenting adults, regardless of gender, to engage in private, non-commercial sexual conduct strikes at the very core of Montana's constitutional right of individual privacy; and, absent an interest more compelling than a legislative distaste of what is perceived to be offensive and immoral sexual practices on the part of homosexuals, state regulation, much less criminalization, of this most intimate social relationship will not withstand constitutional scrutiny.  Quite simply, while legislative enactments may reflect the will of the majority, and, arguably, may even respond to perceived societal notions of what is acceptable conduct in a moral sense, there are certain rights so fundamental that they will not be denied to a minority no matter how despised by society.  In Montana, the right of privacy is such a right.  While nothing in this opinion should be construed to countenance nonconsensual sexual activity, sexual contact with a minor, or any form of sexual conduct for commercial purposes, Montana's constitutional right of privacy--this right of personal autonomy and right to be let alone--includes the right of consenting adults, regardless of gender, to engage in non-commercial, private, sexual relations free of governmental interference, intrusion and condemnation.

Having concluded that   45-5-505, MCA, constitutes a governmental intrusion into Respondents' right to privacy, guaranteed by Article II, Section 10 of Montana's Constitution, and finding no compelling state interest for such an intrusion, we hold that 45-5-505, MCA, is unconstitutional as applied to Respondents and other consenting adults engaging in private, same-gender, non-commercial, sexual conduct, and we affirm the decision of the District Court.

Affirmed.

/S/  JAMES C. NELSON

We Concur:

/S/  WILLIAM E. HUNT, SR.

/S/   JIM REGNIER

/S/   TERRY N. TRIEWEILER

/S/   W. WILLIAM LEAPHART

/S/   KARLA M. GRAY

Chief Justice J. A. Turnage concurring and dissenting:

I agree with the result of this case declaring   45-5-505, MCA, unconstitutional.
However, I dissent to the majority's ruling basing unconstitutionality on Article II, Section 10 of the Montana Constitution.
The majority has unnecessarily and unwisely used privacy as the basis for its decision. Two provisions of the Montana Code are the focus of the issue in this case.

Section 45-2-101(20), MCA, provides this definition:
"Deviate sexual relations" means sexual contact or sexual intercourse between two persons of the same sex[.]   [Emphasis added.]

Section 45-5-505, MCA, provides:
Deviate sexual conduct.  (1) A person who knowingly engages in deviate sexual relations or who causes another to engage in deviate sexual relations commits the offense of deviate sexual conduct.

(2) A person convicted of the offense of deviate sexual conduct shall be imprisoned in the state prison for any term not to exceed 10 years or be fined in an amount not to exceed $50,000, or both.

The statutory scheme of the legislature clearly criminalizes sexual acts between persons of the same sex and decriminalizes the same sexual conduct engaged in by persons of opposite sexes.  Clearly, this is a denial of the constitutional guarantee of equal protection of the law in violation of the Fourteenth Amendment to the United States Constitution and Article II, Section 4 of the Montana Constitution.
To be treated equally under the law is a far broader constitutional right, together with the right of due process, than any other constitutional guarantee in either the federal or state constitution.
I agree with the majority that   45-5-505, MCA, is unconstitutional as applied to noncommercial homosexual activity engaged in by adults consensually and in private.
However, unlike the majority, I would base that determination on violation of constitutional guarantees of equal protection under the Fourteenth Amendment to the United States Constitution and Article II, Section 4 of the Montana Constitution.
The Equal Protection Clause prohibits any classification scheme which fails a

rational basis analysis. Under rational basis analysis, the Court's inquiry must be whether there exists a legitimate government objective which bears some identifiable rational relationship to the classification made. See Burlington Northern R. Co. v. Ford (1992), 504 U.S. 648, 651, 112 S.Ct. 2184, 2186, 119 L.Ed.2d 432, 438; Cottrill v. Cottrill Sodding Service (1987), 229 Mont. 40, 43, 744 P.2d 895, 897.

As is discussed at some length in the majority opinion, 45-5-505, MCA, bears no rational relationship to either of its suggested government purposes, as an expression of societal mores or to protect public health. As an expression of societal mores, the statute is both overbroad and underinclusive, forbidding consensual intimate touching between homosexuals without any evidence that such conduct was historically forbidden, yet permitting heterosexuals to engage in conduct long deemed inappropriate by some segments of society, such as anal sex, sex outside of marriage, and non-procreative sex.

Furthermore, the State has not demonstrated, nor can it demonstrate, that the purpose of 45-5-505, MCA, was or is to protect public health. Not one of the three public health experts who testified in this case suggested that 45-5-505, MCA, offered any benefit to the public health.

In Com. v. Wasson (Kentucky 1992), 842 S.W.2d 487, the Supreme Court of Kentucky struck down a statute similar to 45-5-505, MCA, which defined as a misdemeanor criminal offense "deviate sexual intercourse with another person of the same sex." In doing so, the court reasoned:

In the final analysis we can attribute no legislative purpose to this statute except to single out homosexuals for different treatment for indulging their sexual preference by engaging in the same activity heterosexuals are now at liberty to perform. By 1974 [when the Kentucky statute was enacted] there had already been a sea change in societal values insofar as attaching criminal penalties to extramarital sex. The question is whether a society that no longer criminalizes adultery, fornication, or deviate sexual intercourse between heterosexuals, has a rational basis to single out homosexual acts for different treatment. Is there a rational basis for declaring this one type of sexual immorality so destructive of family values as to merit criminal punishment whereas other acts of sexual immorality which were likewise forbidden by the same religious and traditional heritage of Western civilization are now decriminalized? If there is a rational basis for different treatment it has yet to be demonstrated in this case. We need not sympathize, agree with, or even understand the sexual preference of homosexuals in order to recognize their right to equal treatment before the bar of criminal justice.

Wasson, 842 S.W.2d at 501.

No rational basis has been demonstrated for the classification created under 45-5-505, MCA. I conclude that the statute is violative of the Equal Protection Clauses of the Montana and the United States Constitutions as applied to persons of the same sex

engaging in noncommercial, consensual, private sexual conduct, and is therefore unconstitutional. I therefore dissent and specially concur that 45-5-505, MCA, is unconstitutional as a denial of equal protection.

So much for the unnecessary reliance by the majority on Article II, Section 10 of the Montana Constitution and now as to the basis for the majority opinion being unwise.

The opinion of the majority, I submit, is an open-door invitation to challenges of legislative enactments by the people of Montana, through their constitutionally-empowered legislature, prohibiting conduct that they believe to be destructive to Montana's society as a whole. There are many such statutes on the books that not only have a rational basis but are very important to the people of Montana.

I submit that this Court should not be surprised if one of the first challenges under the theory espoused by the majority in this case will be to 45-5-105, MCA, which provides severe criminal sanctions for a person who purposely aids or solicits another to commit suicide. The majority opinion cites with approval the District Court's statement that "a person's decision as to sexual matters is probably one of the most private areas of a person's life." This statement is correct. However, there is something in the lives of people equally private and more important--the right to life or death.

I respectfully concur as to the result and dissent as to the reasoning used by the majority.

/S/ J. A. TURNAGE